# HIGH COURT

## OF

# ERRORS AND APPEALS.

## DECEMBER TERM, 1841.

---

## Carter, Appellant, *v.* Graves.

Where the objection to written evidence was waived, and it was agreed to let it go to the jury for *what it was worth*, it was held, that the jury was authorized to give it what weight they thought proper.

Where a witness is a distributee of an estate, and the tendency of his evidence is to increase the fund for distribution, he is incompetent.

Where the tendency of the evidence of the distributee would be in one case to pay a debt and receive nothing back, and in another to pay an equal debt and increase the fund for distribution, it was said that the latter circumstance showed such an interest as rendered him incompetent.

If objection to the admissibility of testimony be taken at as early a stage of the trial as it can be made available, it will be sufficient.

Where the interest of the witness came out on cross examination, it was held, that an instruction to the jury to disregard it, was a seasonable objection.

Leaving the possession of property with the vendor, is *prima facie* evidence of fraud, and throws upon the vendee, the *onus probandi*, to show the fairness of the transaction.

APPEAL from the circuit court of the county of Hinds.

Armstead Carter, the plaintiff below, instituted a suit against John M. Graves, to the May term, 1837, of the circuit court of

VOL. VI.—2.

Hinds county, as the assignee of one Thomas Sims, on a note for $8,000, dated 6th June, 1837, and due seven months after date. On the 28th day of November, 1838, Carter recovered judgment against said Graves, on said note, for $9,213.   Previous to this, one Thomas Jones and the said John M. Graves, who were partners, in planting, had filed their bill in chancery, among other things to enjoin the said Carter from proceeding to collect said note.   The injunction as to Carter was dissolved on the 11th day of March, 1839.   On the 19th of March, 1839, Carter caused an execution, issuing on said judgment, to be levied by the sheriff of Hinds county, on certain negro slaves, as the property of the said John M. Graves.   On the following day, (the 20th March, 1839,) Joseph B. Graves, the brother of John M., claimed the negro slaves as his property, and made the affidavit and executed the bond required by the statute, to try the right thereto; which facts were returned by the sheriff on the execution.   At the May term, 1839, an issue was made up, substantially, between the plaintiff in the execution, and the claimant, Joseph B. Graves.

At the trial, the plaintiff in the execution produced the original judgment of the 28th November, 1838, in his favor, for $9,213, against said John M. Graves, and the execution which was levied on the 19th March, 1839, upon the negroes in controversy, and proved by S. F. Bulkley, the deputy sheriff, the levy of the same, and the value of the slaves—about eleven of whom were in possession of claimant.   The plaintiff then called a witness by the name of Burton, who stated that he was the overseer of Jones and Graves during the year 1838, and about one month of the year 1839—that the negroes in controversy, with some exceptions, were on the plantation, and there regarded as the property of John M. Graves, during all the time he remained there, except that in April, 1838, Joseph B. Graves, the claimant, took the girl Hester from said plantation to his own house;—that he never heard of any other owner of said slaves, except the said John M. Graves, whilst he was there.

The plaintiff also called Jesse Puckett, who proved that he also was an overseer on said plantation during the year 1837; that about Christmas of the year 1836, John M. Graves brought upon

said plantation the negroes in controversy, with the exception of ————————, treating them as his own slaves, where they continued in that character whilst he remained.

The plaintiff also called Thomas Jones, who proved that in the fall of 1836, he and John M. Graves purchased of Thomas Sims, in partnership, a plantation and about 16 negroes, in Hinds county; that before that time, John M. Graves was known to him as the holder of a considerable number of negro slaves, which were brought to the country in the month of February, 1836, and then hired out, in said county; that pending the negotiation for the purchase of said plantation and negroes, John M. Graves spoke of his negroes, and stated that he had about ten hands; that towards the close of the year 1836, or 1st of January, 1837, said John M. Graves brought the negroes in controversy to the plantation of Jones and Graves, where they were worked during the year 1837, without any special agreement of hire, but he understood the firm was the debtor of John M. Graves for the hire; that in the fall of 1837, the claimant, Joseph B. Graves, came to Mississippi from South Carolina, and took the slaves, Caswell, Betty, and Becky, home with him; that in April, 1838, he also carried home from said plantation the negro girl Hester; that in the year 1838, the person holding the beneficial interest in the deed of trust on the property, for debt due by their grantor, (Sims,) ordered a sale of so much thereof as might be sufficient to pay that debt, and that upon advertisement of the property for sale for that purpose, Jones & Graves filed a bill of injunction, enjoining the sale, and issuance of execution on the judgment in this case, when rendered, the same not having been then obtained—and the plaintiff then produced the transcript of the record of said suit in chancery, whereby, among other things, it appeared that the injunction was dissolved on the 11th of March, 1839.

Said Jones then continued his statement, as follows: that on the evening of the 11th of March, 1839, John M. Graves returned from Jackson, whither he had gone to attend the chancery court, and informed witness that the injunction had been that day dissolved; that early in the morning of the succeeding day, he started said slaves to the residence of the claimant, where, as he understood, they were, when levied on; that witness had never heard of any

sale of said slaves by John M. Graves to claimant; that he and said Graves resided on the same plantation, and in the same house, and had frequent conversations about their business, and were as intimate as persons connected in business usually are; that when said injunction was dissolved, none of the negroes, except ten of those mentioned in the bill of sale, (Hester having been previously removed,) were in possession of said John M. Graves.    Upon which the plaintiff rested his case.

The *claimant,* Jos. B. Graves, then introduced and proved a bill of sale, from J. M. Graves to himself, dated the 2d day of April, 1838, for the negro slaves Esau, Mary, Howell, Creasy, McPherson, Levi, Fanny, Cherry, Francis, Rachel and Hester, which was duly recorded in the office of the clerk of the Probate court of Hinds county, on the 23d day of May, 1838.

The claimant then introduced John M. Graves.    He was asked if he was the same person who made the bill of sale, and if he was the brother of the claimant, both of which questions he answered in the affirmative; whereupon the plaintiff objected to his competency, but the court decided he was competent to testify, and that his position went to his credibility.    The said John M. Graves then stated, that early in the spring of 1836, intending to come to Mississippi, the negroes in controversy set out for this state in company with his brother, S. A. D. Graves; that he joined them at Augusta, in Georgia, and reached Mississippi in February, 1836; that there were upwards of 20 negroes in all; that he only claimed those in the bill of sale, except one or two of the lot since dead, and as many since born; that the balance belonged to his brothers and sisters; that he never had, or pretended title to any of the negroes now in controversy, except those specified in his bill of sale to Jos. B. Graves; that he sold the negroes mentioned in the said bill of sale, in payment of an honest debt due by him to Joseph B. Graves; that he was debtor on a judgment existing in South Carolina to said Joseph B. Graves; it was a fair and honest debt; that the sale and disposition of the negroes, in said bill of sale mentioned, by him to Joseph B. Graves, was made, first, because he was thus enabled to pay an honest debt, and, secondly, because of the false impression under which Joseph B. Graves and himself had labored, that the judgment in South Carolina would operate as a lien on the

property in Mississippi; that so soon as he became aware of the fallacy of that impression as to the lien, he concluded to adopt the course he pursued, and to make a regular bill of sale to said Joseph B. Graves of said negroes, estimated at a sum sufficient to cover and satisfy said judgment; that there was no fraud intended by him, and that he had nothing whatever in view but to pay what he has always considered, and now considers, an honest debt, due by him to Joseph B. Graves; that from the date of said bill of sale, he ceased to consider himself the owner of the negroes embraced in said bill of sale by him to Joseph B. Graves; that he had commenced a crop when the bill of sale was made by him, and wished to finish the same, and the said Joseph B. Graves was not in a condition to desire or need the services of the negroes; that, perhaps, he might have spoken of all the negroes, during the absence of his brother, as "my negroes;" that he did so because they were under his management and control, not meaning to assert or pretend any title in himself, to any of the negroes, except those mentioned in the bill of sale.

On cross examination, John M. Graves stated, that previous to the bill of sale of the 2d of April, 1838, (for the negroes,) to wit: on the 6th day of February, 1838, he had sold and conveyed to his brother, Joseph B. Graves, a tract of land he owned in Hinds county, for the consideration of $6,670, which was in payment of that much money due from him to said Joseph B. Graves, for money lent, negro hire received by him, and profits made by trading on the cash capital of said Joseph B. Graves; that said land, and the negroes in the bill of sale of the 2d of April, 1838, were all the property he owned, except his interest in the plantation and negroes, on which there were deeds of trust for the payment, under which the negroes have been sold, and sale of land enjoined by a third party; that the consideration for the judgment confessed in South Carolina was this: that he had been engaged in merchandize and trade in South Carolina for several years, and that his father, Joseph Graves, had from time to time advanced him money to enable him to carry on his business, to the amount of about $5,000; that he had sold out his goods and quit business, in consequence of bad health, and received from the purchaser, in payment thereof, bills of exchange, which he had indorsed to his creditors in Charleston. These bills

2*

were not paid, but he was likely to be subjected to liability thereon, in which case he would be deprived of the means of paying his debt to his father's estate, his father being then dead.   By his last will, his father had made himself and said Joseph B. Graves executors; that he had never acted as executor, though he had not regularly relinquished, or declined.   To his brother, Joseph B. Graves, as executor of the estate of their father, he had confessed the judgment stated in said record; that no attempt had been made in South Carolina to collect said judgment; that he had never communicated to any one that the negroes belonging to his brothers and sisters were not his property; that he had not communicated to his partner, Jones, that he had sold his negroes, until the day the injunction was dissolved.   There had been no conversation on the subject, and no occasion for speaking of the title; that he had controlled the negroes brought to this country, and, in a publication in the Clinton Gazette in 1836, he called them his negroes.   He furthermore stated, that in the sale of his negroes to his brother, Joseph B. Graves, on the 2d of April, 1838, he had proposed to his brother that he should permit him to hold the negroes, paying hire, until he might be able to pay him the amount of the South Carolina judgment, and redeem them,—his brother did not dissent from this proposition, nor accept it; and that all the debts against the estate of his father had been paid off and discharged; that he had expected his brother, Joseph B. Graves, to join himself and Jones in the plantation and negroes, but at the time he arrived there was difficulty about the titles and payments, and he refused to become a partner, or otherwise interested therein.

S. A. D. Graves was then called by claimant.   He testified that he had brought all the negroes involved in this controversy from the state of South Carolina, in the month of February, 1836; that John M. Graves overtook him while in charge of the negroes, at Augusta, in Georgia, and that they came on together to Hinds county, Mississippi; that there were upwards of twenty negroes, in all; that John M. Graves never claimed any of the negroes mentioned in the papers, affidavit, &c., except those negroes mentioned in his bill of sale to Joseph B. Graves, hereinbefore referred to; that the others belonged, at all times, to the heirs of Joseph Graves, deceased, the father of the claimant and the witnesses, except John M. Graves,

and that *he* never asserted or exercised acts of ownership over them; that Caswell, at all times since the death of said Joseph Graves, has been the property of Joseph B. Graves, claimant in this cause; that Hester was carried away by claimant, at the time of the making the bill of sale by John M. Graves; that witness, on account of ill health, and upon the advice of his physicians, left Mississippi in the month of June, 1836, and was absent until December, 1837, when he returned; that the claimant did not come out in February, 1836, with him and John M. Graves, when the negroes were brought out, but came in December, 1837; that up to this time, all the negroes were left in charge of John M. Graves.

The claimant then introduced the affidavit of Robinson, which, to avoid a continuance, it was agreed should be read, and to avail as much as the presence of Robinson, testifying to the same facts.

This affidavit proved that Robinson was present at the sale of eleven negroes by John M. Graves to claimant, when claimant took one (girl Hester) home, and hired the balance to John M. Graves; and told witness if John M. Graves would pay him the amount for which said negroes were hired him, that he would let him keep them and work out the debt, which John M. Graves said he wanted to do, &c.

The claimant also introduced what he insisted was the transcript of the record of a judgment, being a penal bond from John M. Graves to Joseph B. Graves, as executor of Joseph Graves, deceased, for about $5,000, and a confession by said John M. Graves that the sum was honestly due, &c., the affidavit of claimant to the same effect, a copy of an execution for the debt, and certificate of judge and clerk, &c.

William M. Rois, Esq. was also introduced by the counsel for the claimant. He proved that he was counsel for Jones & Graves in the bill of injunction, and had informed them that he was of opinion that the contract could be rescinded, if they could prove their allegations; but that the debt of Carter, the plaintiff in the execution, would, as he thought, stand on different grounds, as he had heard that Carter had refused to receive the note on which this judgment is founded until he had applied to them and been informed it would be paid; but Jones & Graves den that any such representation had been made by them to Carter.

Carter, Appellant, v. Graves.

Here the testimony closed.

The counsel for the plaintiff in the execution then stated to the court and jury that they were instructed not to seek to subject any of the negroes in controversy, except those owned by John M. Graves and sold by him to J. B. Graves, and those belonging to J. B. but brought to this county by John M. and held by him as only ostensible owner.

After argument, the plaintiff in the execution moved the court to instruct the jury as follows:

1. That if an absolute bill of sale was made by John M. to Jos. B. Graves, and the possession of the slaves remained with John M. Graves, the conveyance was prima facie fraudulent and void; and the obligation of proving it fair and good is thrown upon Jos. B. Graves, the claimant.

2. That the record of the pretended judgment from South Carolina shows no judgment, the *mind* of the court not appearing to have acted on the confession.

3. If the jury be satified that the conveyance of the slaves was made to satisfy a judgment that was void in law, such judgment would not support the sale, and the conveyance would not be effectual against the plaintiff in the execution; but the court decided that there might be a valid claim as the basis of the proceeding, though the judgment was irregular, informal and invalid as such.

4. That if a judgment be in all things formal and regular, yet if it be confessed or rendered to hinder, delay or defraud creditors, it is void, even though for a just debt.

5. If the intent of this conveyance was to protect John M. Graves in the possession of the negroes, and to pay the debt out of the annual hire, and thereby prevent the sale of them by creditors, the conveyance would be fraudulent and void, and the negroes would be liable to the execution.

6. If the sale was *bona fide* to Joseph B. Graves, as executor of Joseph Graves, deceased, and to pay a debt due from John M. to the testator, in that case the negroes would belong to the children of the said testator, and they could not be witnesses; and therefore the jury must reject the testimony of John M. and Stephen A. D. Graves, being children and heirs of the said Joseph Graves, deceased.

7. If Joseph B. Graves be innocent in this transaction, and either he or Carter must suffer by the act of John M. Graves, that Joseph B. Graves, who enabled John M. to do the wrong, must bear the loss.

All which instructions, with the qualification annexed to the *third*, the court gave.

The jury found for the claimant, and thereupon the plaintiff in the execution moved for a new trial, upon these grounds, to wit:

1. The claim of Joseph B. Graves is based upon a transcript, called the *record of a judgment*, which, *if valid*, was shown by the proof to be *fraudulent*, and is therefore void.

2. The transcript has no one characteristic of a judgment, and is not one.

3. The proof, at the least, made out, prima facie, a case of fraud, and there was no evidence to show that the conveyance was not made with the "intent and purpose to hinder, delay or defraud" *the plaintiff* in the execution. The proof of the claimant—other than said pretended and fraudulent judgment, and said bill of sale— consisted of the written statement of what Robinson would prove, and the oral evidence of said John M. and Stephen A. D. Graves. If said judgment could be held to be valid, it is in favor of the executor of the estate of the father of these two witnesses. The transaction proved was an arrangement by which the executor, in payment of a debt due the estate, received eleven negroes. It being in proof that the debts of the estate were paid, these negroes are for distribution among the children of the testator. The only two witnesses, then, who were examined, were *directly* interested in the event of the trial, to the extent of more than two negroes each. The court admitted them against the exception of the plaintiff in the execution, though the true character they sustained had not then been disclosed—they were unquestionably incompetent. The plaintiff, therefore, moves for a new trial, because of the admission of illegal testimony.

4. If the jury were influenced by the testimony of those two witnesses, their verdict rests upon illegal testimony, and must be set aside.

5. If they were not, there is no testimony upon which it can rest; and it must therefore, also, be set aside.

6. The verdict of the jury is contrary to the evidence and the law in the case.

The court overruled the motion for a new trial, from which decision of the court an appeal was then prayed, and the bill of exceptions, embracing the foregoing facts, signed, and the bond executed and approved according to law.

Rucks for appellant.

The badges of fraud are numerous and palpable. The bill of sale was absolute, and possession remained with the vendor.

Jos. B. Graves proves he had no use for the negroes, and could not employ them. There could have been no object, but to enable Jno. M. Graves to keep the negroes and defeat his creditors.

There was a secret trust between the parties, that Joseph B. G. should hold the title, and permit Jno. M. to keep and employ the negroes as before. Twinc's case, 3 Coke R. 81; 20 John. 450; 35 Law Lib. 9; 3 Cain's Rep. 223.

There was no consideration for the bill of sale. The pretended judgment in South Carolina was got up between the same brothers to defraud the creditors of Jno. M. in that state, and is void.

It is impossible to look into the circumstances of the case without seeing most palpably that there was fraud in fact.

Whether the facts and circumstances amount to fraud, is a question of law, and the court will grant a new trial if the jury formed a wrong inference. Bright *v.* Eyman, 1 Bur. 393, 5, 6.

The court, upon error, will order new trial: Upon new trial, if the juries persist in rendering verdicts for the plaintiff, when, from the evidence, he is not entitled to recover. Trott *v.* West, Meigs' R. 163, 166.

If there is a great preponderance of evidence—showing the verdict is unjust, even in a matter of damages—this court will order a new trial. Ingraham *v.* Russel, 3 How. 304.

This verdict against the plaintiff is contrary to the evidence, which was overwhelming and conclusive, and brings the case within the rule of a great preponderance of testimony.

The verdict is in favor of defendant without any evidence to

Carter, Appellant, *v.* Graves.

rebut the presumption of law from the fact of the possession being inconsistent with the deed—therefore the verdict is without evidence.

Briggs for defendants or appellees.

1. Was the action of the court, in refusing a new trial, (which is assigned for error,) excepted to at the moment, as required under the decisions of this court? (1 Howard, 126 and 573.) See Record, p. 5 and 35. Quere?

2. Is the case properly in court?

A. Carter was plaintiff below, and *he* failed to get a verdict.

The appeal was granted to and prayed for *by the plaintiff*, (A. Carter.) It was not prayed for by Michael Erskine, who brings the cause into this court, who styles himself *"assignee,"* but who is not known on the Record at all. See transcript, p. 5 and 6.

It is true that the law places it in the power of any one injured by a decision of the court, to have recourse to the appellate court. I contend, however, that *the Record must show* the attitude and interest of such an one. If his name does not appear from the Record as directly connected in interest with the proceedings below, there is no showing of a right to appeal. It was the business and province of Michael Erskine, (the real plaintiff in error,) who styles himself "assignee," to have made proof or amply satisfied the court that he was "assignee," and thus injured, or likely to be injured, by the refusal to grant a new trial. The record shows no such thing, and 'non constat' *from the record*, but that Erskine was, and now is, a mere volunteer to harrass my client by an appeal, and, which is just as bad, to make a lawless invasion of the boundaries and privileges of this court.

The court will recollect the case of Flournoy *v.* Smith, &c. reported in Howard's Reports, 3d vol. p. 62, involving this question of "right to appeal." I am fortified in the view taken by the fact that the name of Flournoy—the purchaser at the sale of land sought to be vacated and set aside in the Madison circuit court—appeared, or must have necessarily appeared, *upon the record.* The sheriff returned his execution with the levy on the land, *the name of the purchaser,* &c. endorsed thereon. That return, of

course, was a part of the record, and the purchaser was quasi a party, and the real party injured.

I repeat again, that the appeal was prayed for *by the plaintiff* below, not by M. Erskine, and was granted in consideration that bond should' be given by Michael Erskine, C. R. Clifton and A. Richey—all of which is irregular. (Record, p. 5 and 6.)

This court, being compelled to be jealous and suspicious on the subject of jurisdiction, will take notice at any time that a case has been thrust upon it irregularly and illegally.

3. But if there is a necessity to go into the merits of the case, I remark that the assignment of errors (particularly the first specification) is almost too general and indefinite. At any rate, the second specification embraces as well the first specification as the gist of the whole matter in issue.

Were the reasons assigned to the court below sufficient to give the plaintiff a new trial?

It is contended (as the first reason given) that Joseph B. Graves's claim was based upon the record of a judgment in South Carolina, shown by the proof to be fraudulent and void.

There was no such proof; on the contrary, it was directly proved to have been honest and fair.

Besides, said judgment, &c. shows, as part of its basis and foundation, the oath (affidavit) of Joseph B. Graves, that the sum mentioned in the judgment confessed in South Carolina, in April, 1835, was "fairly and bona fide due, and that such confession is not for the purpose of defrauding the just creditors of John M. Graves." (Record, p. 24.) This is at least sufficient to require to be overcome by proof that said judgment confessed was perfected for unfair purposes, and *that* proof was not furnished.

It is objected (as reason the second) by the plaintiff, that the transcript of the South Carolina judgment in favor of the defendant, Joseph B. Graves, "has no characteristic of a judgment, and is not one."

To this it is obvious to answer, that we are bound to presume that the proceedings were taken in conformity with the law of S. Carolina, where it was given. That presumption was not attempted to be overcome, and the proceedings. of that (our sister) state are entitled to the highest respect and countenance.

Carter, Appellant. *v.* Graves.

But again: On referring to the record, page 23, it will be found that, speaking of the transcript of the South Carolina judgment, it is stated that "the counsel for the plaintiff at first objected to its introduction," &c. &c. &c. "but finally, to save discussion, agreed that said record (if such it could be called) should go before the jury for what it was worth."

Now, how is it possible that this court can rule out a portion of the evidence which was passed upon by the jury, when its admission was expressly agreed to by the plaintiff himself, in the court below? It cannot be done.

4. All other objections failing, it will probably be insisted that when the bill of sale was made by John M. Graves to Joseph B. Graves, in payment of the debt due by him, viz. on the 2d April, 1838, possession did not follow or accompany the bill of sale, and hence the sale was fraudulent *per se* and void.

I reply to this thus:

In the first place, the whole current of modern decisions is against the rule sought to be deduced from Twyne's case in Coke, and other old cases accordant therewith.

The doctrine now is fully established, that where possession of personal property does not follow an absolute bill of sale, the transaction is only prima facie (not per se) fraudulent. The difficulty may be explained away.

The case of Hamilton *v.* Russell, so much relied on in favor of the "per se" doctrine, is entitled to much more respect in the state of Virginia than here; because in making a decision in a case arising under the Virginia law, the U. S. Supreme court was bound to follow the Virginia decisions. See 3 Yerger, 475; ibid, 502; 4 do. 164, 541; Cowper, 435; 5 Johnson, 261; 9 ibid, 338; 17 John. 332; Bissel *v.* Hopkins, 3 Cowen, 166; 1 B. & B. 506. (Con. Eng. Com. Law Reports.)

5 and lastly. This court always is disposed to sustain decisions below, and especially decisions made by juries where the case is complicated; where fraud is charged; and where the credibility of witnesses is sought to be involved.

The granting or refusing of new trials is, it is true, matter of investigation in this court. Nevertheless, the subject is still within the sound discretion of the court below.

Carter, Appellant, *v.* Graves.

Palpable injustice must have been done to cause this court to interfere against the decision of the jury and of the court below, by granting a new trial. It would not be sufficient to show that the matter was doubtful: nor yet can this court grant the new trial upon the supposition that were the court of the jury it would decide differently. At the most, taking a view of this whole case favorable to plaintiff, there is complexity, doubt and difficulty; and such a case is always surrendered to the juries of the country.

C. R. Clifton, in reply.

Most of the States of the Union, like our own, have enacted statutes, embracing, substantially, the leading principles of the 13th and 27th of Elizabeth, as to the effect of conveyances; but have expressed them in language of such slight and varying shades of difference, as to deny the hope, were there not other circumstances to make us despair, of any uniform rule of decision on this subject.

The decisions of judges of almost every grade of intellect, from the loftiest to the most humble—indoctrinated into different modes of thinking—surrounded by every variety of circumstances, both social and political—influenced, occasionally, no doubt, by false benevolence, for an isolated case of hardship, and incapable, in many instances, of taking a comprehensive survey of the great and complex interests of mankind—cannot be otherwise than they have been upon this statute, conflicting and unsatisfactory. They can be of little service, therefore, in guiding this court to a salutary and wholesome construction of the statute, which shall harmonize with its original spirit and design, and protect the morals and promote the welfare of this restless and enterprising people.

It is the part of wisdom not to risk the danger of being misled, in this dusky twilight of contradictory adjudications, but to remount, at once, to the source of light—the well-considered opinions of those great luminaries of the law, by whom the statute was first expounded.

The common law itself has so great an antipathy to fraud, that it was an observation of Lord Mansfield, that the principles and rules of the common law, as then universally understood, were so strong against fraud in every shape, that it was calculated to attain

Carter, Appellant, *v.* Graves.

every end and purpose proposed by the statutes of 13th and 27th of Elizabeth.

It was the prevention, and not the punishment, of fraud, says Mr. Roberts, in his treatise on these statutes, (page 520,) in which the common law was defective—for there is no instrument or act which is not liable, by the law of this country, to be rendered absolutely void, by clear and explicit evidence of fraudulent intention—so general, indeed, is the condemnation of fraudulent acts by the law of England, that a fraudulent estate, in the masculine language of the books, is said to be *no estate*, in the judgment of the law.

Lord Coke declared that these statutes were legislative recognitions of the common law; and it has been held by the English judges, repeatedly, since that time, that they were merely in affirmance of it.

If so, the best exposition of the statutes is to be found in the decisions of the English judges, whose resolutions, as to the common law, are of the highest authority.

In the simple ages of the law, the ownership of movable chattels or personal property was alone ascertained by the possession; or, in other words, *possession* and *property* were *identical*. This was the doctrine of the common law; and it could not have been the object of the statute to facilitate the commission of fraud, by multiplying the difficulties of detecting it; which would certainly be its effect, unless those circumstances which constituted fraud at common law should be held to have the same effect under the statute.

The first time the 13th of Elizabeth came to be considered, was the celebrated case of Twyne—where a party, being indebted to one man in the sum of four hundred pounds, and to another in two hundred pounds, pending a suit by the latter, secretly conveyed all his property, of the value of three hundred pounds, to the former, in satisfaction of his debt, retaining the possession and acting as the owner. The creditor having obtained judgment for the two hundred pounds, sued out his execution, and the question was, whether the goods were liable. The lord keeper of the great seal, the chief justices, and the whole court of Star Chamber, held that the conveyance was fraudulent within the statute: 1. Because

it embraced all the donor's property; 2. because he continued and exercised acts of ownership; 3. it was made in secret; 4. pending the suit; 5. there was a trust between the parties, the donor keeping all the goods and using them as his own; 6. the deed expresses that it was made *honestly*, *truly* and *bona fide*, which, of itself, induces suspicion.

The general conclusion from this case of Twyne, is, that evidence of the fraudulent intent supercedes the whole inquiry into the consideration; for no merit in any of the parties to a transaction can save it, if it carries, intrinsically, or extrinsically, the plain characters of fraud; and one of the plainest of these characters of fraud, is the possession of the party contradicting the visible purport of an absolute conveyance; which inconsistent retention of the thing pretended to be transferred, is very much aggravated, as an evidence of fraud, if the possession is accompanied by acts of ownership—for this plainly denotes a secret separation of the legal and beneficial property. Roberts on Fraud. Conv. 548. And in Edwards *v.* Harben, it was held, that when the conveyance is absolute, and without a change of possession, the transaction is fraudulent in point of law; and it was said by Sir Edward Northey, in Bucknal *v.* Roiston, that it had been ruled forty times, in his experience, at Guildhall, that if a man sold goods, and still continued in possession, as visible owner of them, such sale was fraudulent and void as to creditors, and that the law had always been so holden. Ib. 564.

And such have been the decisions in England to the present day, so far as the counsel are informed, with the exception, only, of cases where the deed is upon condition, and provides for the continuance of possession in the grantor; or where property has been purchased at sheriff's sale, and left with the debtor; or where possession of the thing sold was incapable of transfer; or in cases of a similar character, attended by special circumstances.

The Supreme Court of the United States, with a noble and manly compliance, has followed the lead of the great minds of England on this subject, by declaring, " that an absolute bill of sale is itself a fraud, unless possession accompanies and follows the deed; and further, that this construction comports with the words of the statute." 1 Cranch, 309.

Carter, Appellant, *v.* Graves.

In this, it has been followed by the courts of Virginia, Kentucky and Pennsylvania. 2 Mumford, 341; 5 Ib., 28; 2 Hen. & Mun., 289; 1 Littell, 112; 5 Sergt. & Rawle, 278; 4 Binney, 258.

The counsel is aware that there has been an industrious, and, to some extent, successful attempt, in several of the states, to repudiate this construction; but, as it is calculated to conserve the public morals, and promote the ends of justice; as it removes all temptation to perjury, and gives a uniform rule, (which can never be expected from the varying opinions of juries,) it commends itself to the enlightened approbation of the court; which will seize every legitimate occasion to establish such rules of action as will tend to accomplish these great objects. It is the result of observation, that a fraud, deliberately conceived and perpetrated, where the rule prevails that possession in the vendor against an absolute bill of sale is susceptible of explanation, will be sustained at every sacrifice; and to allow such rule is to deny to the statute that beneficial and equitable construction to which, according to well established principles, it is entitled. Roberts on Fraud. Conv., 542.

II. But if the court should be of opinion that the circumstances attending the sale do not make it fraudulent *in law*, then we contend it was fraudulent *in fact;* that is, that the facts disclose an intention to commit a fraud, and prove that the conveyance was made to hinder, delay, and defraud the plaintiff; and in this respect, it matters not as to the consideration, for the law makes no exception in favor of such conveyance, where there is a fraudulent intention. 8 Johns. Rep. 446; 12 Ib. 320.

Intention is a question of fact, to be collected from all the circumstances.

If, therefore, a conveyance be made by one who is insolvent, as in this case, even on a good and sufficient consideration advanced to him, and the purchaser is conusant of, and assenting to the fraudulent intent, it is void against creditors. Howe *v.* Ward, 4 Greenleaf, 195; 8 Johns. Rep. 446; 12 Ib. 320; 2 Johns. Chancery Rep. 35. But if the claimant is not tainted by the fraud, he ought not to hold the property to the exclusion of the plaintiff; but it ought to be sold to satisfy the plaintiff's judgment, and he turned back upon John M. for his damages; because it is a rule of law, that where one of two innocent parties must suffer by the fraud of

3*

a *third person, he who trusted such third person, or so acted with him as to enable him to commit the fraud, must bear the loss.* 2 Tenn. Rep. 70; 4 New Hamp. Rep. 455.

If this sale be held to be valid, it will not only hinder and delay, but will actually defeat the plaintiff, Carter, in the collection of this debt; because John M. Graves, having previously conveyed his real estate to the same individual, has no other property out of which the debt can be made. As long as man is regarded as a rational being, he must be held to intend the probable consequences of his own conduct. 2 Starkie, 738–9. (New edition, 416.) The consequence of the conveyance, by John M. Graves, of all his property, to his brother, Joseph B., is, necessarily, if it prevails, not only to hinder and delay, but defeat Carter, in the satisfaction of his judgment; and he must be held, therefore, to have intended it.

The courts which reject the doctrine for which we contend, as to fraud in law, all hold that possession in the donor is strong *prima facie* evidence of fraud, and that the obligation of proving it fair is upon the adverse party. In this case it was not done.

But admitting the transaction, as explained by John M. and S. A. D. Graves, to have been perfectly fair and honest; still the court below was bound to set aside the verdict and grant a new trial, and ought to have done so, of its own mere motion, or cease to be considered a constituent element of the tribunal of justice, because they were incompetent, and the jury were so informed, before they retired from the bar, and there was no other testimony upon which their verdict could rest.

It was in proof that the eleven negroes which the plaintiff seeks to subject to the satisfaction of his judgment, were sold by John M. Graves, the defendant in the execution, to his brother Joseph B., the claimant, in payment of a judgment which John M. had confessed in South Carolina, in favor of Joseph B., as executor of their father's estate, for upwards of $5,000, and that the debts of that estate had been fully paid off and discharged—from which it results, as a legal consequence, that these negroes were for distribution among his heirs, of whom these witnesses were two. They were, therefore, directly interested in the result of the trial, to the extent of about two negroes each, and were, of course, not competent witnesses. When, in the progress of the trial, this was perceived, a motion was

made to the court to instruct the jury to reject their testimony—which instruction the court gave. In this aspect of the case, then, it is material to inquire, whether or not there were sufficient facts proved by the claimant, independent of the testimony of his two brothers, to support his claim; because, if there were not, then the verdict below was contrary to, or without evidence, and the court erred in not setting it aside.

Mr. Chief Justice SHARKEY delivered the opinion of the court.

On the 28th of November, 1838, the appellant recovered a judgment against John M. Graves for the sum of $9,213, and sued out a *fieri facias* thereon, which was levied on eleven negroes found in the possession of the appellee, who claimed them as his property, and gave bond to try the right according to the statute. An issue was tendered by the plaintiff in execution, on which issue was joined, and a verdict found for the appellee. The questions for determination are presented by a bill of exceptions taken by the appellant, on the overruling a motion for a new trial.

It becomes material, in the first place, to define the precise attitude of the case, as it is presented to us by the record; and by so doing, we shall be enabled to direct our inquiries to such points only, as are necessarily involved. With a view no doubt to a full and fair investigation of the whole case, the discussion has been extended to questions which do not, as we think, properly arise. Seven charges were asked of the court by Carter, the plaintiff in the execution. They were all given without objection on the part of Graves. In this respect, no error can be complained of as having been committed by the court in giving these charges, either because they were too restricted or too broad. The appellant had the full benefit of the instructions as they were asked. The bill of exceptions was taken to the judgment of the court, in overruling a motion for a new trial, and it is only as an application for a new trial that we can consider of the case. In doing this, we shall necessarily have to determine how far the verdict conforms to the charges of the court; and, to some extent, the legality of the charges may in this way become the subjects of investigation. The reasons assigned for a new trial are seven in number :

Carter, Appellant, *v.* Graves.

First: That the claim of Joseph B. Graves is based upon a transcript called the record of a judgment, which, if valid, was shown by the proof to be fraudulent, and is therefore void, and

Second: The transcript has no one characteristic of a judgment, and is not one.

These reasons do not require separate notice, as they both relate to the admissibility of the judgment. When the claimant offered this judgment in evidence, it was objected to, but the objection was waived, and it was "agreed that it should go before the jury for what it was worth." Under this agreement, it is now too late to object to its admissibility. Letting it go for what it was worth was giving it to the jury without qualification. No evidence can go to a jury for more than it is worth, and none should go for less. When it is admitted in this way by consent, the jury are authorized to give it just so much weight as they may think proper. How much they may have considered it worth cannot be known, and is not therefore a good reason for a new trial.

Third: That the proof made out a *prima facie* case of fraud; and there was no evidence to rebut the presumption of fraud, as the only rebutting proof calculated to remove the presumption, consisted of the testimony of John M. Graves and S. A. D. Graves, who, by establishing the validity of the sale to Joseph B. Graves, shewed themselves to be interested as distributees of Joseph Graves, deceased, of whose estate Joseph B. Graves was executor, and the debt which the property was sold to pay being due to him in that right; and also because this testimony was admitted against the objection of the appellant. This is the substance of the third and principal reason for a new trial, to which may be added the fourth and fifth, which constitute but parts of the same question, to wit:

Fourth: If the jury were influenced by the testimony of those two witnesses, their verdict rests upon illegal testimony, and must be set aside; and

Fifth: If they were not so influenced, there is no testimony upon which it can rest, and it must therefore be set aside.

The foregoing reasons present two questions; first, what interest will render a witness incompetent? and, second, when must the objection be made?

Carter, Appellant, *v.* Graves.

1. John M. Graves was the only witness who explained the whole of the transaction. By the plaintiff in the execution, it was fully proven that he, Graves, brought the negroes to this state in 1836, and had continued to hold possession of them until shortly before the levy. He had claimed and spoke of them as his own, and they were so understood to be by every one, even by his partner in the farm. The claimant, in support of his title, after the appellant had closed his testimony, introduced in the first place a bill of sale for the negroes, from John M. Graves, dated the 2d of April, 1838; but, as he had retained possession long after the date of the bill of sale, further proof became necessary to rebut the presumption of fraud arising from this circumstance, and accordingly John M. Graves was introduced to prove the fairness of the transaction. He testified that he sold the negroes to pay a just debt, which had been contracted with his father, Joseph Graves, in his lifetime, for money loaned, and that the bill of sale was free from the taint of fraud. The title which vested in Joseph B. Graves was as executor of his father, and the witness was one of the distributees. This circumstance is urged as a disqualification of the witness, as the property became, by the sale, a part of the estate out of which he was entitled to distribution. On the other hand, it was contended that his interest was balanced, or neutralized, since if the sale to his brother prevailed, he was discharged of a debt to the value of the negroes; and if they were liable to the execution, they would still go in payment of a debt to the appellant.

An interest to render a witness incompetent must be direct in the event of the suit; or, if he can avail himself of the verdict by giving it in evidence in a future cause in support of his interest, he is incompetent. Roscoe on Evidence, 81. Thus it is said the residuary legatee is incompetent in a suit brought by the executor to recover a debt due the testator. Id. 82. The interest in such case is quite apparent. The amount recovered, even if applied in discharge of specific legacies, would enlarge the residue of the estate. A distributee is incompetent for the same reason. By enlarging the fund to be distributed, he swells his portion, and although it be increased but an inconsiderable amount, it makes no difference; it is the certainty of interest, and not the amount, which disqualifies. And it must also be a present, vested interest; not doubtful,

or depending on mere possibility. An insolvent debtor is not a competent witness, where his testimony would increase the general fund. Wherever the effect of the verdict is to increase or diminish a fund in which the witness has a joint interest, he is incompetent. 1 Starkie, 105. John M. Graves being a distributee, was entitled to a portion of the fund created by establishing the validity of the sale, and it was a direct, present, vested interest, and unless there was a countervailing interest, he was incompetent. Where the interest is neutralized by an exact equipoise, the incompetency ceases; but if there be conflicting interests, one of which preponderates over the other, the difference constitutes an absolute interest, which renders the witness incompetent. 1 Starkie, 119.

It would be perhaps difficult, in this instance, to say whether the countervailing interests were so exactly equipoised as to remove the supposed bias. The sale was for a certain sum; at sheriff's sale property might sell for a greater, or perhaps more frequently at a less, price than it would bring at private sale. Hence a state of doubt might arise in the mind of a witness calculated to superinduce a bias. For this reason the competency of the witness was at least doubtful. But suppose his interest was exactly balanced by paying as much of his debt to the appellant as he was to receive from the claimant, still there is a preponderating circumstance. In selling the negroes he paid a debt of six thousand one hundred dollars, and he added eleven negroes to an estate out of which he was entitled to distribution. He was entitled to receive back a portion of the negroes so sold. In the one case he paid so much, and received part of the property back; in the other case, suppose the same sum was paid, still nothing was received back. This was sufficient to turn the scale against his competency, and it is no answer to say that a previous distribution of the estate had taken place. A new fund was created, which would entitle the distributees to a second division. If John M. Graves had received his full portion of the estate, including this addition—or if Joseph B. Graves had received this debt as a part of his portion, and had by that means acquired an individual right to these negroes—then, of course, the objection could not be successfully urged; but the record does not satisfactorily show that John M. Graves had received a full portion, including the sum of money due from him;

and it is distinctly stated that Joseph B. Graves purchased the negroes as executor, and that they became a part of the estate of his father. Although the legal title may have vested in him individually, yet he was evidently a trustee for the distributees, which would leave the interest without material change.

The testimony of S. A. D. Graves is liable to the same objection. He was also a distributee of his father's estate, and entitled to a portion of the negroes, if the sale should be established. On the ground of incompetency, both of these witnesses might have been excluded; and this brings us to the other branch of the inquiry, to wit:

2. When must the objection to competency be made? Neither of the witnesses were sworn on their *voire dire,* but at the outset of the examination, John M. Graves was asked if he was the same person who made the bill of sale, and if he was brother to the claimant? He answered in the affirmative, and thereupon the plaintiff in the execution objected to his competency. This objection was made at the proper time; but it was made for reasons, as it would seem, that were insufficient. His incompetency on the score of interest, as distributee, was not drawn in question; and the objection which was taken was properly overruled, if it was predicated, as we may suppose, on an affirmative answer to either of the interrogatories propounded. But, on his cross-examination, he explained fully the whole transaction, and then it was that he stated that the sale was made to satisfy a debt due to his father's estate, which had been matured into a judgment in favor of his brother, as executor. This explanation was made after he had been examined in chief, and after he had stated that the sale was made for a full consideration and without fraud. Under this disclosure of interest, after the examination had been concluded, the competency of the witness, on the ground of interest, was objected to, and the court was asked to instruct the jury that if the sale to Joseph B. Graves was *bona fide,* as executor of Joseph Graves, deceased, and to pay a debt due to the deceased, then the negroes would belong to the estate, or to the children of the deceased, and that they could not be witnesses, and the jury must reject the testimony of J. M. and S. A. D. Graves—which instruction the court

Carter, Appellant, *v.* Graves.

gave, and the question is, could the plaintiff in execution make the objection at this stage of the proceeding.

The original rule was, that an objection to competency ought to be taken previous to an examination in chief, either by an examination of the witness on his *voire dire*, or by showing his interest by other evidence; but by the later practice this rule has been much relaxed, and if the interest is discovered at any time during the trial, the evidence may be struck out. 1 Starkie on Evidence, 122; Roscoe on Evidence, 80. After the trial, it is too late to object to the competency of a witness on a motion for a new trial, if the testimony was permitted to go to the jury without objection. The objection is supposed to have been waived by the party against whom it was given. 1 Wash. C. C. Rep. 440; 5 Cowen, 173; 9 ditto, 140; 1 T. Rep. 717. It would be manifestly improper to allow the objection, made for the first time on an application for a new trial, because the party then cannot obviate the objection by release or discharge, as he might have done if it had been taken in time. An advantage may, indeed, be obtained by omiting to make the objection in an early stage of the trial; but this, in many instances, cannot be avoided. The interest of the witness is frequently not discovered until he is cross-examined, and it would operate as a hardship in such cases to deprive the party of his objection. If the interest be known to him, it must be urged at the beginning of the trial. In this case the objection was not made at the moment the interest was discovered, and may therefore seem to fall short of the rule; but it was taken in the only manner that the objection could have been made. The witness had been examined by the claimant, and had stated the nature and fairness of the contract to the jury. There was no remedy for this but to tell the jury to disregard it, and this could be as well told them at the time of giving the charge as when it was first discovered. If the objection had been taken by counsel at the moment it was discovered, it could only have been done by telling the jury to disregard the evidence, and the effect must be precisely the same, when they are so told before they have retired to consider of the evidence. The object is to prevent the influence of the evidence, and, when it has already been given, it can be counteracted only

by telling the jury that in their deliberations they must disregard it. If this be done at any time before the jury retires, and they obey the instructions, then, of course, the object is accomplished. And as it is their duty to follow the instructions of the court in rejecting the evidence, if it becomes manifest that they did not do so, a new trial is the proper remedy.

The question here presented is fully met by the decision in the case of Baldwin *v.* West, in which the court declared that "objections to the competency of witnesses never come too late, but may be made at any stage of the cause." Hardin's Rep. 50. And in the case of Turner *v.* Pearte, 1 Dun. & East. 717, the admission is clearly made that the objection may be raised at any time during the trial, in case it should turn out that the witness is interested. In that case the motion for a new trial was made on the ground of the incompetency, which was refused, because it was not objected to at the trial. To the same effect is the rule laid down by Starkie. He says, "When it is discovered incidentally, in the course of a cause, that the witness is interested, his evidence will be struck out, although no objection has been made to him on the *voire dire*." 1 Starkie on Evidence, 124. The case of Buching *v.* Gower, 3 Eng. Com. Law Rep. 117, may appear to militate against this well established rule; but it does not, as I conceive, when rightly understood, produce the slightest conflict. The parties had closed their case, when the chief justice called up a witness (who had been examined and cross-examined) for the purpose of asking him a question, and from his answer a doubt arose upon his interest, and a re-examination was claimed for the purpose of showing his incompetency, but it was refused. The obvious reason was, that the parties had closed their case and would not be allowed to open it. The judge admitted that the objection might be taken at any time during the examination, but remarked that "when the witness leaves the box, there is an end of all questions to his competency;" by which I understand only, that the cause cannot be opened and the witness again examined as to new facts; but I do not understand that his previous disclosures are no longer the subject of comment. If the incompetency of a witness appears from the examination on his *voire dire*, or if it appears in the opening of his testimony, then, of course,

Carter, Appellant, *v.* Graves.

he is to be excluded, and not allowed to testify further. But if he has gone through his testimony, the remedy is by directing the jury to disregard it. This, I think, can be as well done when the court comes to charge the jury as before. The trial is still in progress, and it may be truly said in such case, that the objection was taken during the trial. The objection in this case was so taken, and we think it was in time.

What is the effect on the case? The court charged the jury that leaving possession with the vendor was *prima facie* evidence of fraud. We cannot say that it was less than *prima facie* evidence of fraud, and the state of the case does not require us to say that it was more. Being a *prima facie* case of fraud, the *onus probandi*, to prove the honesty and fairness of the sale, was thrown upon the claimant. To do this, John W. Graves was introduced, and he was the only witness who explained it. The testimony of S. A. D. Graves, even if it were unobjectionable, does not strengthen the claimant's case, and, stript of the testimony of those two witnesses, it presents a case of fraud made out by *prima facie* evidence which is wholly unexplained and unrebutted. If there was conflicting testimony left, there might still be grounds for refusing a new trial; but there is not. Hence the last reason assigned for a new trial becomes apparent, to wit: That the verdict of the jury was contrary to the evidence and the law of the case. By law the evidence of the two Graves's was incompetent, and they were bound to reject it—but it is manifest that they did not; or if they did, then there was no evidence to support the verdict, and it is therefore contrary to evidence, and should have been set aside.

Judgment reversed, and a new trial granted.